## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Richard L. Downs

    v.

Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration

Civil No. 14-cv-319-LM
Opinion No. 2015 DNH 113


### O R D E R

Pursuant to 42 U.S.C. § 405(g), Richard Downs moves to reverse the Acting Commissioner's decision to deny his application for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382.  The Acting Commissioner, in turn, moves for an order affirming her decision.  For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ") is affirmed.


### Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of

the Commissioner of Social Security as to any fact, if
supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing

§ 405(g) as the standard of review for SSI decisions).  However,

the court "must uphold a denial of social security . . .

benefits unless 'the [Acting Commissioner] has committed a legal

or factual error in evaluating a particular claim.'"  Manso-

Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting

Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting

Commissioner's findings of fact be supported by substantial

evidence, "[t]he substantial evidence test applies not only to

findings of basic evidentiary facts, but also to inferences and

conclusions drawn from such facts." Alexandrou v. Sullivan, 764

F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,

360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial

evidence is 'more than [a] mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d

594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the

[Commissioner] to determine issues of credibility and to draw

inferences from the record evidence.  Indeed, the resolution of

conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts (document no. 9).  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Before the onset of Downs's alleged disability, he was a line cook at a hotel (1990-2004), a maintenance worker at a ski resort (2004-2011), and a prep cook at a restaurant (2011-2012). At his hearing before the ALJ, Downs testified that he left his job as a prep cook because of problems with his back and hepatitis.

Downs's medical records document diagnoses of and treatment for a variety of physical conditions, along with evaluations of his physical residual functional capacity.[1]   However, because Downs's claims of error by the ALJ focus on his mental impairments, the court need not provide a detailed description of his physical impairments.   That said, the court notes that Downs's medical records include evidence of: (1) alcohol abuse, see Tr. 484, which Downs denied at his hearing, see Tr. 34; (2) drug abuse, see Tr. 322, 476, 484, 598; and (3) drug-seeking behavior, see Tr. 484, 598-99, 620, 626.

In October of 2005, Downs was referred by New Hampshire Disability Determination Services to Dr. Cheryl Bildner, a clinical psychologist, for an intelligence profile.   Dr. Bildner gave the following overview of the results of Downs's intelligence testing:

> Mr. Downs was administered eleven subtests of the Wechsler Adult Intelligence Scale for Adults-Third Edition (WAIS-III).   The Full Scale Intelligence Quotient (FSIQ) is the aggregate of the Verbal and Performance scores and is considered the most representative estimate of global intellectual functioning.   Mr. Downs's cognitive ability is in the Extremely Low range of intellectual functioning, as measured by the WAIS-III.   His overall thinking and reasoning abilities exceed those of approximately 1% of adults his age (FSIQ = 63, 95% confidence interval = 60-68).   Mr. Downs may experience difficulty in keeping up with his peers in a wide variety of

---

[1] "Residual functional capacity," or "RFC," is a term of art that means "the most [a claimant] can still do despite [his] limitations."   20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

situations that require age appropriate thinking and
reasoning abilities.

Administrative Transcript (hereinafter "Tr.") 281.  Ultimately,

Dr. Bildner diagnosed Downs as having mild mental retardation.

She also assessed his then-current level of functioning.  With

regard to understanding and memory, she wrote:

> Mr. Downs exhibited impairment in cognitive capacity.
> He can perform basic tasks, however, performance would
> decline with increasing complexity.  Some instructions
> may need to be repeated until concept is fully
> grasped.  Task completion dependent on literacy would
> also be problematic due to Mr. Down[s]'s impaired
> literacy skills.

Tr. 283.  With regard to social functioning, Dr. Bildner found

that "Mr. Downs can interact appropriately and communicate

effectively with others."  Id.  With regard to concentration and

task completion, she wrote:

> Mr. Downs can sustain adequate attention and
> concentration, as evidenced by completion of cognitive
> testing and interview.  He can also complete basic
> tasks.  Performance is likely to decline with task
> complexity and if task completion was dependent on
> literacy skills.

Id.  Finally, with respect to adaptation to work and work-like

environments, Dr. Bildner found: "Mr. Downs can make simple

decisions.  He can maintain a work schedule.  He can interact

appropriately with his supervisor."  Id.

In November of 2005, William Jamieson completed a

Psychiatric Review Technique form on Downs, in which he

evaluated Downs's mental retardation.[2]  With respect to
functional limitations, Jamison determined that Downs had no
difficulties with maintaining social functioning, mild
restrictions with respect to activities of daily living, mild
difficulties in maintaining concentration, persistence, or pace,
and no extended episodes of decompensation.  He also made the
following note:

> Although claimant does have significant cognitive
> limitations, he has been able to sustain competitive
> employment in the past, and there is nothing to
> suggest any subsequent deterioration.  Recent psych CE
> describes adequate abilities in simple work situations
> with appropriate supervision.

Tr. 297.

In May of 2013, Dr. Bildner examined Downs and completed a
Mental Health Evaluation Report on him for New Hampshire
Disability Determination Services.  She diagnosed him as
suffering from anxiety disorder and gave a "rule-out" diagnosis

---

[2] "The [psychiatric] review technique is used to rate the
severity of mental impairments at Steps Two and Three of the
sequential evaluation process [described more fully below], and
also serves as the backdrop for the more detailed mental RFC
assessment at Step Four [also described more fully below]."
Littlefield v. Colvin, No. 14-cv-53-LM, 2015 WL 667641, at *3
n.5 (D.N.H. Feb. 17, 2015) (quoting Pelletier v. Colvin, C.A.
No. 13-651 ML, 2015 WL 247711, at *12 (D.R.I. Jan. 20, 2015)).

of borderline intellectual functioning.[3]  She reported the
following findings with regard to Downs's then-current level of
functioning:

> Claimant is unable to independently complete
> activities of daily living.  He is currently homeless.
> He is unable to read or write.  He does not have a
> vehicle and limited access to running water.  He is
> not currently maintaining his hygiene and his clothing
> is not appropriately laundered.
>
> . . . .
>
> Claimant is unable to interact appropriately with
> others.  He becomes anxious in large crowds.  Claimant
> is not maintaining his hygiene which will interfere
> with social functioning.  Claimant is able to
> communicate basic information.
>
> . . . .
>
> Claimant is able to understand simple instructions.
> Cognitive limitations exist that will interfere with
> his ability to understand more complex and abstract
> information.
>
> . . . .
>
> Claimant is unable to sustain attention and
> concentration to complete tasks in a timely manner.
> He is unable to persist at tasks.
>
> . . . .

---

[3] "'Rule-out' in a medical record means that the disorder is
suspected but not confirmed – i.e., there is evidence that the
criteria for a diagnosis may be met, but more information is
needed in order to rule it out." Byes v. Astrue, 687 F.3d 913,
916 n.3 (8th Cir. 2012) (citing United States v. Grape, 549 F.3d
591, 593 n.2 (3d Cir. 2008)).

> Claimant is unable to manage stress common to a place
> of employment.  He is unable to keep a schedule.  He
> is unable to interact appropriately with others.  He
> is able to make simple decisions.

Tr. 452-53.  Dr. Bildner concluded with the following prognosis:
"Claimant lacks resources to access health care and mental
health services.  Claimant is not currently taking care of
himself.  Return to work in forseable [sic] future is unlikely."
Tr. 453.

Also in May of 2013, Dr. Michael Schneider reviewed Downs's
records and conducted both a psychiatric review technique and an
assessment of Downs's mental residual functional capacity.  Both
were based upon a diagnosis of anxiety disorder.  As a result of
his psychiatric review technique, Dr. Schneider determined that
Downs had: (1) moderate restrictions in his activities of daily
living; (2) moderate difficulties in maintaining social
functioning; (3) moderate difficulties in maintaining
concentration, persistence or pace; and (4) no repeated episodes
of decompensation.  In his assessment of Downs's mental residual
functional capacity, Dr. Schneider made a number of more
specific findings.

With respect to social interaction, Dr. Schneider found
that Downs had: (1) no significant limitations in his abilities
to ask simple questions, request assistance, and get along with
coworkers or peers; and (2) moderate limitations in his

abilities to interact appropriately with the general public,
accept instructions and respond appropriately to criticism from
supervisors, maintain socially appropriate behavior, and adhere
to basic standards of neatness and cleanliness.

With respect to sustained concentration and persistence,
Dr. Schneider found, among other things, that Downs had: (1) no
significant limitations in his abilities to carry out short,
simple instructions, maintain attention and concentration for
extended periods, perform activities within a schedule, maintain
regular attendance, be punctual within customary tolerances, and
make simple work-related decisions; and (2) a moderate
limitation in his ability to sustain an ordinary routine without
supervision.

Dr. Schneider concluded his assessment of Downs's mental
RFC with a narrative that includes the following comments:

> For opinions of function, [Dr. Bildner's report] for
> the most part [was] not consistent with the evidence
> presented.  For example, [she] states that the
> claimant is unable to independently complete
> activities of daily living.  While this may be true
> for activities that require reading and writing, the
> claimant is able to cook, which is something he has
> done for employment and he does take care of his own
> finances.  She also maintains that he is unable to
> interact appropriately with peers and supervisors, yet
> there was nothing in the examination and his
> interactions with her that would suggest this.
> Therefore, those opinions are not given any weight.
>
> The claimant does have a severe impairment, which does
> not currently meet or equal listing levels.  Despite
> the claimant's impairment, he remains capable of

understanding, remembering and carrying out short and
simple, orally presented instructions without special
supervision.  For anything requiring reading and
writing, he would need special supervision.  He is
able to maintain adequate attention for these kinds of
instructions and complete a normal eight hour workday
and 40 hour work week.  The claimant is able to
interact appropriately with peers and supervisors only
in an environment where he avoids the general public,
work environments that would require interaction with
large numbers of people and where the supervisory
criticism is not overly critical of his performance.
[sic]  Under those conditions, he is able to
accommodate to changes in a work setting.

Tr. 72.

After conducting a hearing, the ALJ issued a decision that

includes the following relevant findings of fact and conclusions

of law:

3.  The claimant has the following severe impairments:
Diabetes Mellitus, degenerative disc disease of the
lumbar spine, Hepatitis C/chronic liver disease,
obesity, borderline intellectual functioning and
Anxiety Disorder (20 CFR 404.1520(c) and 416.920(c)).

.  .  .  .

4.  The claimant does not have an impairment or
combination of impairments that meets or medically
equals the severity of one of the listed impairments
in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,
and 416.926).

.  .  .  .

5.  After careful consideration of the entire record,
I find that the claimant has the residual functional
capacity to perform light work as defined in 20 CFR
404.1567(b) and 416.967(b) except he can occasionally
climb, balance, stoop, crouch, and crawl.  The
claimant is limited to simple unskilled work, is able
to maintain attention and concentration for two-hour

10

> increments throughout an 8-hour day, should avoid
> social interaction with the general public, but can
> sustain brief and superficial social interaction with
> co-workers and supervisors.
>
> . . . .
>
> 6.  The claimant is unable to perform any past
> relevant work (20 CFR 404.1565 and 416.965).
>
> . . . .
>
> 10.  Considering the claimant's age, education, work
> experience, and residual functional capacity, there
> are jobs that exist in significant numbers in the
> national economy that the claimant can perform (20 CFR
> 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 11, 12-13, 14, 20, 21.  Based upon his assessment of Downs's

residual functional capacity, and a hypothetical question posed

to a vocational expert ("VE") that incorporated the RFC recited

above, the ALJ determined that Downs was able to perform the

jobs of flower-care worker in a greenhouse setting, office

cleaner, and price marker.  At the hearing, and in response to a

question from the ALJ, the VE testified that if the hypothetical

were amended to include an inability "to follow or understand

even simple instructions without special accommodations,"[4] Tr.

49, that limitation "would eliminate the ability to sustain any

work," id.  Similarly, in response to a question from Downs's

---

[4] It is not at all clear that such a limitation is supported
anywhere in the record.  Even Dr. Bildner's 2013 report, which
includes the psychological opinion most favorable to Downs,
describes him as "able to understand simple instructions," Tr.
453, and does not describe him as unable to follow such
instructions.

attorney, the VE testified that the ability to sustain any work
would also be precluded by an inability to keep a schedule and
an inability to sustain attention and concentration to complete
tasks in a timely manner.  See id. at 50.

**Discussion**

A. The Legal Framework

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible
for supplemental security income, a person must be aged, blind,
or disabled, and must meet certain requirements pertaining to
income and assets.  42 U.S.C. § 1382(a).  The question in this
case is whether Downs was under a disability from January 1,
2013 through the date of the ALJ's decision.

For the purpose of determining eligibility for disability
insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A)
(setting out a similar definition of disability for determining
eligibility for SSI benefits).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he
> applied for work. . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also

42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for

determining eligibility for SSI benefits).

To decide whether a claimant is disabled for the purpose of

determining eligibility for either DIB or SSI benefits, an ALJ

is required to employ a five-step process.  See 20 C.F.R. §§

404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that he is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  However,

> [o]nce the [claimant] has met his or her burden at
> Step 4 to show that he or she is unable to do past
> work due to the significant limitation, the
> Commissioner then has the burden at Step 5 of coming
> forward with evidence of specific jobs in the national
> economy that the [claimant] can still perform.  Arocho
> v. Sec'y of Health & Human Servs., 670 F.2d 374, 375
> (1st Cir. 1982).  If the [claimant's] limitations are
> exclusively exertional, then the Commissioner can meet
> her burden through the use of a chart contained in the
> Social Security regulations.  20 C.F.R. § 416.969;
> Medical-Vocational Guidelines, 20 C.F.R. pt. 404,
> subpt. P, App. 2, tables 1-3 (2001), cited in 20
> C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458
> (1983).  "The Grid," as it is known, consists of a
> matrix of the [claimant's] exertional capacity, age,
> education, and work experience.  If the facts of the
> [claimant's] situation fit within the Grid's
> categories, the Grid "directs a conclusion as to
> whether the individual is or is not disabled."  20
> C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited
> in 20 C.F.R. § 416.969.

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

> [i]n assessing a disability claim, the [Acting
> Commissioner] considers objective and subjective
> factors, including: (1) objective medical facts; (2)
> [claimant]'s subjective claims of pain and disability
> as supported by the testimony of the [claimant] or
> other witness; and (3) the [claimant]'s educational
> background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

### B. Downs's Claims

Downs claims that the ALJ's assessment of his RFC is not
supported by substantial evidence and that the jobs identified
by the VE, at step five, require abilities that he does not
have.  The court considers each argument in turn.

### 1. RFC

The court begins by noting that Downs's first claim is
nearly devoid of a legal argument.  Rather, it consists almost
exclusively of a list of subjective complaints, diagnoses, and
treatments presented without any reference to relevant legal
principles or any actual reasoning.  That list does not merit
the court's attention.  See Kalantzis v. U.S. Soc. Sec. Admin.,
Comm'r, No. 13-cv-12-JL, 2014 WL 580143, at *3 (D.N.H. Feb. 10,
2014) (citing Montero v. Colvin, No. 12-cv-412-JL, 2013 WL
4042424, at *1 n.1 (D.N.H. Aug. 8, 2013); see also Dawes v.
Astrue, No. 1:11-cv-272-DBH, 2012 WL 1098449, at *7 (D. Me. Mar.
30, 2012)).

However, notwithstanding the substantial underdevelopment
of Downs's first claim, the court is able to discern the hint of
one cognizable argument, i.e., that the ALJ erred by crediting

the opinion of a nonexamining medical source (Dr. Schneider) over the opinion of an examining medical source (Dr. Bildner) with respect to Downs's abilities to maintain a schedule and sustain attention and concentration to complete tasks in a timely manner.  Dr. Schneider opined that Downs had those abilities.  See Tr. 71.  Dr. Bildner opined that he did not. See Tr. 453.

The applicable Social Security regulations define "medical opinions" as "statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including . . . [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical and mental restrictions."  20 C.F.R. §§ 404.1527(a)(2) & 416.927(a)(2).  However, a doctor's recording of a claimant's "complaints in his notes does not convert [those] subjective complaints . . . into medical opinion, thus entitling [them] to some measure of deference." Ford v. Barnhart, No. 04-CV-194-PB, 2005 WL 1593476, at *8 (D.N.H. July 7, 2005) (citing 20 C.F.R. §§ 404.1527(a)(2), 404.1527(d), 416.927(a)(2) & 416.927(d)).  Similarly, "subjective complaints are not entitled to greater weight simply because they appear in [a] physician's notes."  Id. (citing Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996)).

Generally speaking, Social Security decision makers "give more weight to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [him]."  20 C.F.R. §§ 404.1527(c)(1) & 416.927(a)(1).  However, just as an ALJ may properly decline to give controlling weight to the opinion of a treating source, see, e.g., Bourinot v. Colvin, --- F. Supp. 3d ---, ---, 2015 WL 1456183, at *11 (D. Mass. Mar. 30, 2015) (citing Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991)), an ALJ may also discount the weight given to the opinion of an examining source in favor of the opinion of a nonexamining source.

When determining the weight to give to a medical opinion, the ALJ must consider the nature of the relationship between the medical source and the claimant, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the source of the opinion is a specialist, and other factors.  See 20 C.F.R. §§ 404.1527(c) & 416.927(c).  With regard to supportability, the regulations explain:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with [a claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the

pertinent evidence in [a] claim, including opinions of
treating and other examining sources.

20 C.F.R. §§ 1527(c)(3) & 416.927(c)(3).

The ALJ explained his decision to discount Dr. Bildner's

opinion this way:

> [H]er opinion that the claimant is unable to
> independently complete activities of daily living is
> unsupported by any medical signs concerning mental
> impairments, and instead she identified his self-
> reported history that he is homeless, unable to read
> or write, does not have a vehicle, and has limited
> access to running water. These are not work-related
> functional limitations related to a diagnosed
> impairment. She further opined that he is unable to
> interact appropriately with others, and is unable to
> sustain concentration persistence and pace; however,
> this is primarily all based on the claimant's self-
> reported symptoms, and does not address how
> polysubstance abuse may affect these functions.
> Additionally these opinions are inconsistent with
> ongoing medical exam reports that identify minor or no
> limitations. Further supporting little weight for
> [Dr. Bildner]'s opinion is that, as an examining
> psychologist, her conclusions are based on this one-
> time exam, and her report does not indicate she
> reviewed the longitudinal record.

Tr. 20. The ALJ explained his decision to give Dr. Schneider's

opinion great weight this way:

> I considered and gave great weight to the opinion of
> state Disability Determination Services (DDS)
> [psychologist] Michael Schneider, Psy.D., who opined
> that the claimant is capable of understanding,
> remembering, and carrying out short and simple, orally
> presented instructions without special supervision;
> and can maintain adequate attention for these kinds of
> instructions and complete a normal workday and week.
> . . . He is able to interact appropriately with peers
> and supervisors, and where the supervisory criticism
> is not overly critical of his performance. I give
> great weight to this opinion because it is consistent

with the claimant's activities and physical exam notes
that indicate some cognitive limitations.

Tr. 19-20 (citation to the record omitted).

The court begins by noting that there are aspects of the
ALJ's analysis that cause concern.  Several of the criticisms he
directs toward Dr. Bildner's opinion apply with equal force to
Dr. Schneider's opinion.  For example, neither one addresses the
effect of polysubstance abuse on Downs's functional capacity.
And, while Dr. Bildner's 2013 report does not indicate that she
reviewed Downs's longitudinal record,[5] Dr. Schneider's assessment
does not indicate that he reviewed any part of Downs's
longitudinal record other than Dr. Bildner's 2013 report.[6]  In
addition, while the ALJ discounted Dr. Bildner's conclusions
because they were based upon a one-time examination, Dr.
Schneider did not examine Downs at all, and the ALJ does not
explain how no examination provides more reliable evidence than
one exam.  Dr. Bildner saw Downs; Dr. Schneider saw Dr.
Bildner's report.  Based upon the foregoing, if the ALJ's

--------

[5] For what it is worth, Dr. Bildner herself was the author
of one key piece of the longitudinal record, i.e., the
intelligence profile she completed in October of 2005.

[6] Moreover, while Dr. Bildner's 2013 report does not
indicate that she reviewed her 2005 intelligence profile of
Downs, it is interesting to note that in 2013, Dr. Bildner did
not explain why she changed her mind with regard to Downs's
abilities to maintain a schedule and sustain concentration and
attention, abilities she said he had in 2005, but said he lacked
in 2013.

decision were subject to de novo review, the court might be inclined to remand this case.

But conflicts in the evidence, such as the difference of opinion between Dr. Bildner and Dr. Schneider (and the difference of opinion between Dr. Bildner's 2005 intelligence profile and her 2013 report), are for the Acting Commissioner to resolve, not the court.  See Irlanda Ortiz, 955 F.2d at 769. And this court is not permitted to substitute its judgment for that of the ALJ so long as the ALJ's decision is supported by substantial evidence.  See Tsarelka, 842 F.2d at 535.  The substantial evidence supporting the ALJ's decision to discount Dr. Bildner's opinion is embodied in his cogent observations that: (1) Dr. Bildner's opinion depends far more on Downs's reports to her about his living conditions than it depends on her identification of functional limitations resulting from his mental impairments, see Ford, 2005 WL 1593476, at *8 (distinguishing between a claimant's reports to a medical source and a medical opinion); and (2) the functional limitations Dr. Bildner identified are not supported by the medical evidence. With respect to the ALJ's second observation, the court notes several inconsistencies in Dr. Bildner's 2013 report: (1) Dr. Bildner opined that Downs was "unable to keep a schedule," Tr. 453, but under the heading "mental status examination," reported that he arrived for his appointment on time, after a drive of

several hours in a borrowed vehicle, see Tr. 451; and (2) Dr. Bildner opined that Downs "was unable to sustain attention and concentration to complete tasks in a timely manner," Tr. 453, but under the heading "mental status examination," reported that Downs's "[a]ttention and concentration were fair," Tr. 451-52. Finally, the court notes that as between Dr. Bildner and Dr. Schneider, Dr. Schneider offers the more detailed and persuasive explanation for his opinion, which bolsters its supportability. See 20 C.F.R. §§ 1527(c)(3) & 416.927(c)(3).

To be sure, there are cases that merit remand because of the manner in which an ALJ "ascribe[d] more weight to the opinions of non-treating, non-examining [medical sources] than those of examining medical professionals." Hainey v. Colvin, No. 14-cv-144-SM, 2014 WL 6896022, at *6 (D.N.H. Dec. 5, 2014). Hainey was such a case; this one is not.  In Hainey, Judge McAuliffe remanded because he determined that: (1) "the ALJ may have misunderstood claimant's current activities of daily living [and] relied on incorrect or no longer applicable facts," id. at *5; and (2) the ALJ relied upon a lack of mental-health treatment that was "far more likely explained by claimant's lack of health insurance and limited access to health care than by the absence of a treatable problem," id.  This case does not involve any error such as the ones described in Hainey, but

rather, the ALJ's adequately supported decision to resolve a conflict in the evidence.

To sum up, the ALJ's decision to credit Dr. Schneider's opinion over Dr. Bildner's opinion provides no basis for the remand Downs seeks.

### 2. Step Five

Downs also claims that the ALJ's step-five determination that he can perform the jobs of flower-care worker, office cleaner, and price marker is not supported by substantial evidence because his low IQ and his inability to read preclude him from meeting the general educational development ("GED") requirements established for those jobs in the Dictionary of Occupational Titles ("DOT").[7]  The court does not agree.

Each job listed in the DOT carries with it a set of three GED requirements, one each for reasoning development, mathematical development, and language development.  In each area of development, the DOT rates the level required for any particular job on a scale of one through six, with one being the

---

[7] "The Dictionary of Occupational Titles (DOT) is 'a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy.'" Frasier v. Colvin, No. 9:12-cv-01947-DCN, 2014 WL 526400, at *20 n.17 (D.S.C. Feb. 10, 2014) (quoting Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002)).

lowest.  Two of the three jobs identified by the VE, flower-care worker[8] and office cleaner,[9] require the lowest level of development in each of the three relevant areas.  In the area of reasoning development, level one requires a person to "[a]pply commonsense understanding to carry out simple, one- or two-step instructions [and] [d]eal with standardized situations with occasional or no variables in or from these situation encountered on the job."  DOT, Vol. II, at 1011 (4th ed. 1991). In the area of language development, level one requires a person to have, among other things, the ability to "[r]ecognize [the] meaning of 2,500 (two- or three-syllable) words [and] [r]ead at a rate of 95-120 words per minute."  Id.

Downs claims that the ALJ committed reversible error by determining that he could perform jobs requiring level-one reasoning development without factoring in his low IQ and his diagnosis of mental retardation.  Because there is evidence in the record that Downs has the mental RFC to carry out very short and simple instructions, and no evidence to the contrary, his argument based upon his level of reasoning development is unavailing.  Consequently, the ALJ did not err by relying upon

---

[8] The job the VE called "flower-care worker" is listed in the DOT as "flower picker," occupation no. 405.687-010.

[9] The job the VE called "office cleaner" is listed in the DOT as "cleaner, housekeeping," occupation no. 323.687-014.

the VE's testimony that Downs was capable of performing the jobs of flower-care worker and office cleaner, each of which requires only level-one reasoning development.

Downs's stronger claim is that his inability to read precludes him from performing jobs requiring level-one language development. While that argument has some surface appeal, it ultimately fails for several reasons.

First, while Downs now claims an inability to perform any job requiring level-one language development, his employment record shows that: (1) he worked for approximately seven years as a maintenance worker (listed in the DOT as "janitor," occupation no. 382.664-010), a job requiring level-three language development (and level-three reasoning development); and (2) he worked for two years as a prep cook (listed in the DOT as "cook helper," occupation no. 317.687-010), a job requiring level-one language development (and level-two reasoning development). Thus, as a factual matter, there is no basis for Downs's current claim that his inability to read renders him incapable of performing jobs requiring level-one language development. See Donahue v. Barnhart, 279 F.3d 441, 445 (7th Cir. 2002) (noting illiterate claimant's previous employment of 23 years and pointing out that "[i]lliteracy is not a progressive disease"); Warf v. Shalala, 844 F. Supp. 285, 290 (W.D. Va. 1994) (rejecting claimant's argument that

illiteracy precluded him from performing job identified by VE that required level-one language development and pointing out that the claimant had previously held a job requiring level-two language development).

Second, as a purely legal matter, this court is persuaded by both the decisional law and the relevant Social Security regulations that illiteracy is not a categorical bar to the performance of jobs requiring level-one language development. As Judge Whipple has explained:

> Every job in the DOT has a Language Development level. Level 1 is the lowest Language Development level used in the DOT.  A decision holding that illiterate individuals could not perform Level 1 jobs would mean that illiteracy was a per se disability under the DOT. Illiterate people would not qualify to work any job listed in the DOT.  The Court believes that such a holding is illogical and would directly contradict the Social Security regulations.

Lawson v. Apfel, 46 F. Supp. 2d 941, 947 (W.D. Mo. 1998).  The court held that belief because the Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2, describe several circumstances under which persons who are illiterate or unable to communicate in English are not deemed to be disabled.[10]  See id.  In short, this court joins with Judge Whipple and Judge

---

[10] For example, a younger individual (18-44), who is capable of only sedentary work, is illiterate, and who has no previous work experience or experience in unskilled work, is considered to be not disabled under the Medical-Vocational Guidelines.  See 20 C.F.R. § 404, Subpt. P, App. 2, Rule 201.23.

Williams, both of whom have rejected the proposition that illiteracy is a per se bar to performing any of the jobs listed in the DOT.  See id.; Warf, 844 F. Supp. at 290 ("to hold that the DOT 'definitional requirements' [which include the GED ratings] are binding on the ALJ would lead to the absurd result of rendering anyone who is illiterate unqualified and unable to perform any of the jobs in the DOT").

Based upon both Downs's own employment history and the legal analysis described above, the court concludes that the ALJ did not err by relying upon the VE's testimony that Downs was capable of performing the jobs of flower-care worker and office cleaner, each of which requires only level-one language development.

The bottom line is this.  The VE testified that Downs could perform two jobs requiring the lowest levels of reasoning, language, and mathematical development.  The ALJ had no basis to determine that Downs did not meet those GED requirements.  Thus, the ALJ permissibly relied upon the VE's testimony that Downs was capable of flower-care work and office cleaning.  Because "'[a] single occupation is sufficient to meet the commissioner's burden' at Step 5 of the evaluation process," McGrath v. Astrue, No. 10-cv-455-JL, 2012 WL 976026, at *10 (D.N.H. Mar. 22, 2012) (quoting Welch v. Barnhart, No. 02-247-P-C, 2003 WL 22466165, at *4 (D. Me. Oct. 31, 2003)), the ALJ's step-five determination

provides no basis for remand, and the court need not consider whether Downs is capable of performing the job of price marker (occupation no. 209.587-034), which requires level-two reasoning development.

### Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Downs's claim, see Manso-Pizarro, 76 F.3d at 16, his motion for an order reversing the Acting Commissioner's decision, document no. 7, is denied, and the Acting Commissioner's motion for an order affirming her decision, document no. 11, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 8, 2015

cc:  Christine Woodman Casa, Esq.
     T. David Plourde, Esq.